Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/12/2023 09:06 AM CDT

Charter West Bank, a Nebraska banking
corporation, appellee, v. Justin E. Riddle
and Erin M. Riddle, appellants.

___ N.W.2d ___

Filed May 12, 2023.    No. S-22-557.

1. **Jurisdiction: Statutes.** Subject matter jurisdiction and statutory interpretation present questions of law.
2. **Judgments: Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.
3. **Injunction: Equity.** An action for injunction sounds in equity.
4. **Equity: Appeal and Error.** On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court.
5. **Right to Counsel: Effectiveness of Counsel.** A self-represented litigant will receive the same consideration as if he or she had been represented by an attorney, and, concurrently, that litigant is held to the same standards as one who is represented by counsel.
6. **Jurisdiction: Appeal and Error.** Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.
7. **Jurisdiction: Words and Phrases.** Subject matter jurisdiction is the power of a tribunal to hear and determine a case in the general class or category to which the proceedings in question belong and to deal with the general subject matter involved.
8. **Jurisdiction: Appeal and Error.** Where a lower court lacks subject matter jurisdiction to adjudicate the merits of a claim, issue, or question, an appellate court also lacks the power to determine the merits of the claim, issue, or question presented to the lower court.
9. **Federal Acts: Courts: Jurisdiction.** The federal and state courts have concurrent jurisdiction over claims arising under the Lanham Act, 15 U.S.C. § 1051 et seq. (2018).

10. **Federal Acts: Proof: Intent.** Generally, to prevail in a cybersquatting claim under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) (2018), a plaintiff must show (1) it owned a mark; (2) its mark was distinctive or famous at the time of registration of the defendant's domain name; (3) the defendant registered, trafficked in, or used the domain name; (4) the defendant's domain name was identical or confusingly similar to, or in the case of a famous mark, dilutive of, the plaintiff's mark; and (5) the defendant had a bad faith intent to profit.

11. **Evidence: Words and Phrases.** Evidence consists of facts admitted at a trial to establish or disprove the truth of allegations put in issue by the pleadings.

12. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

Appeal from the District Court for Douglas County: J Russell Derr, Judge. Reversed, injunction vacated, and dismissed.

Justin E. Riddle, pro se, and Erin M. Riddle, pro se.

Jeffrey A. Silver for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

## I. INTRODUCTION

This appeal turns on whether a bank's "mark" qualified for protection under the federal Anticybersquatting Consumer Protection Act (ACPA).[1] The bank claimed that a married couple threatened to use a website to "disseminate adverse information" unless the bank purchased it for $1 million. The district court issued a permanent injunction in the bank's

---

[1] See Anticybersquatting Consumer Protection Act, Pub. L. No. 106-113, § 3002, 113 Stat. 1501 (codified at 15 U.S.C. § 1125(d) (2018)).

favor. Because the ACPA required the bank to prove it owned a mark that was "distinctive" or "famous," and it failed to do so, we reverse the district court's judgment, vacate its injunction, and dismiss the action.

## II. BACKGROUND

### 1. Parties

According to the operative complaint, Charter West Bank (Charter West) is a Nebraska banking corporation with its main office located in West Point, Nebraska. It has branch offices located in Elkhorn, Nebraska; Papillion, Nebraska; Pender, Nebraska; and Walthill, Nebraska.

Justin E. Riddle and his wife, Erin M. Riddle, are former customers of Charter West who applied for a mortgage loan that was denied.

### 2. Federal Lawsuit

Prior to the instant case, the Riddles filed a lawsuit against Charter West and an instrumentality of the federal government as a result of the denial of their mortgage loan. The Riddles' lawsuit was removed to federal court.

At some point during that litigation, Justin notified Charter West via email that he had purchased a website associated with the domain name "www.charterwestbank.com" (the website). Justin indicated that he planned to use the website to post information that would reflect negatively upon Charter West, and he later informed Charter West that the website "is for sale."

Charter West sent the Riddles an email in which it offered "to settle [the federal case], subject to execution of a [c]onfidential [s]ettlement [a]greement." In the email, Charter West offered payment to the Riddles in exchange for their transfer of the website to Charter West. The Riddles rejected Charter West's settlement offer via email that same day.

### 3. ACPA Complaint

Shortly after the Riddles rejected Charter West's settlement offer in the federal case, Charter West filed a separate lawsuit against the Riddles—pursuant to the ACPA[2]—in state district court. The ACPA case led to the instant appeal.

In Charter West's complaint, it recited that the Riddles had filed a lawsuit against it and an instrumentality of the federal government after the Riddles' application for a mortgage loan was denied and that the Riddles' lawsuit had been removed to federal court. Charter West alleged that "[w]hile the [federal case] is pending," the Riddles purchased the website, and that they "threatened to use th[e] website to disseminate adverse information." It further alleged that the Riddles had "a bad faith intent to exploit the [website] to customers of Charter West that seek banking information via the internet." Finally, it alleged that the Riddles "offered to sell the [website] to Charter West for $1 million."

Charter West requested the district court issue a preliminary and permanent injunction enjoining the Riddles from displaying the website online, as well as a further order directing the Riddles to transfer the website to Charter West.[3]

There were three exhibits attached to the complaint. The first exhibit was a list of domain names owned by Charter West. The second exhibit was a series of emails exchanged between the parties relating to the federal case. The third exhibit showed the content displayed on the website. It appears from the record that the website consisted of a single webpage, which purported to be a "Corruption Report" on Charter West and the other defendant involved in the federal case.

---

[2] See § 1125(d). See, also, Black's Law Dictionary 486 (11th ed. 2019) (defining "cybersquatting" as "[t]he act of reserving a domain name on the Internet, esp[ecially] a name that would be associated with a company's trademark, and then seeking to profit by selling or licensing the name to the company that has an interest in being identified with it").

[3] See § 1125(d)(1)(C).

### 4. Preliminary Injunction

The district court held a hearing on Charter West's request for a preliminary injunction, during which it received evidence from both parties. Charter West offered three exhibits that showed the parties' email correspondence relating to the federal case. The emails generally discussed ongoing discovery matters, Charter West's settlement offer, and Justin's use of the website. The Riddles' evidence included a letter that served as Charter West's "mediation report" in the federal case, documentation regarding their mortgage loan application that was denied, and excerpts from a PowerPoint presentation that discussed the ACPA.

Following the hearing, the district court entered an order issuing a preliminary injunction that prevented the Riddles from displaying in any manner or form, or in any social media, the domain name associated with the website "or any iteration of that domain name." It stated that the Riddles "may not sell, assign or transfer [the website] until further order of the [c]ourt."

### 5. Trial

After the federal case concluded, the district court held a bench trial in the ACPA case. There are two aspects of trial that require summary.

At the outset, the court and the parties discussed the absence of an answer. The court noted that it had previously ordered the Riddles to file an answer to the ACPA complaint, but there was no answer in the court's record. Therefore, it explained, the cause was technically in default. Charter West represented that it had received an "answer" from the Riddles, even if it was not properly filed in the court, and the court proceeded with the trial.

Turning to the evidence adduced at trial, Charter West introduced the three exhibits that it had previously attached to the ACPA complaint, the exhibits already received by

the district court at the preliminary injunction hearing, and a transcript from the preliminary injunction hearing. It also introduced an email exchange that took place after the preliminary injunction hearing and a decision[4] of the U.S. Court of Appeals for the Eighth Circuit showing that the federal case had concluded. The Riddles introduced as evidence a law review article discussing Fed. R. Evid. 408.

### 6. ORIGINAL JUDGMENT ON ACPA VIOLATION

Following trial, the district court entered a judgment, styled as an order, finding that the Riddles had violated the ACPA. However, it determined that Charter West failed to meet its burden of showing a permanent injunction should issue. It reasoned that there was no evidence before the court of any actual damages, real or irreparable, past or present, suffered by Charter West due to the Riddles' actions.

Based on its finding that the Riddles violated the ACPA, the court ordered them to transfer their interest in the domain name "www.charterwestbank.com" to Charter West within 30 days.

### 7. MOTION TO ALTER OR AMEND

Charter West filed a timely motion to alter or amend the district court's judgment. In the motion, Charter West asked the court "to include the requested permanent injunction" as a result of its finding that the Riddles violated the ACPA.

### 8. AMENDED JUDGMENT GRANTING PERMANENT INJUNCTION

Following a hearing on the motion, the district court entered an amended judgment (styled as an order) granting Charter West's request for a permanent injunction. It explained: "Here, upon further review by the [c]ourt, [the Riddles'] own

---

[4] *Riddle v. Charter West Bank*, 787 Fed. Appx. 360 (8th Cir. 2019).

words reveal their intent, and the very real possibility of irreparable harm exists—in fact [the Riddles] state[] their intent is to use the domain name charterwestbank.com to cause harm to [Charter West]." It provided various excerpts from the parties' email correspondence. Then, it concluded:

> The potential for future harm—unquantifiable harm—if [the Riddles] are allowed to continue to use the domain name, is irreparable and there is no adequate remedy at law. In balancing the hardships between each party, the [c]ourt notes that [the Riddles] face[] no hardship in refraining from willful domain site infringement, whereas [Charter West] faces hardship from loss of business, reputation, etc. . . . [T]here is nothing to prevent [the Riddles] from continuing to be critical of [Charter West] using other means . . . but [the Riddles] should not be able to confuse consumers that [the Riddles'] website is in fact that of [Charter West] by continuing to use the [website].

The court issued a permanent injunction enjoining the Riddles from using the website or any other domain name containing the words "charter west."

The Riddles filed a timely appeal and proceed as self-represented litigants. We moved their appeal to our docket.[5]

### III. ASSIGNMENTS OF ERROR

The Riddles assign, reordered, that the district court erred in (1) exercising jurisdiction, because "the [ACPA] and freedom of speech fall firmly under federal jurisdiction"; (2) "failing to recognize that [Charter West] does not qualify for [ACPA] protection"; (3) "allowing settlement emails [into evidence] in violation of rule 408"; (4) "granting [Charter West] judgment against the [Riddles] for cybersquatting"; and (5) "ruling that the [Riddles] can not use [a domain name containing] any iteration of '[C]harter [W]est.'"

---

[5] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2022).

## IV. STANDARD OF REVIEW

[1,2] Subject matter jurisdiction and statutory interpretation present questions of law.[6] An appellate court independently reviews questions of law decided by a lower court.[7]

[3,4] An action for injunction sounds in equity.[8] On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court.[9]

## V. ANALYSIS

[5] As an opening matter, we begin our analysis by recalling that a self-represented litigant will receive the same consideration as if he or she had been represented by an attorney, and, concurrently, that litigant is held to the same standards as one who is represented by counsel.[10] To the extent the Riddles urge us to apply "'less stringent standards'"[11] here, we decline to do so and hold them to the same standard that is demanded in any other case.

With that settled, we turn to the Riddles' assignments of error.

### 1. Jurisdiction

[6] Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether

---

[6] *County of Lancaster v. County of Custer*, 313 Neb. 622, 985 N.W.2d 612 (2023).

[7] *McGill Restoration v. Lion Place Condo. Assn.*, 313 Neb. 658, 986 N.W.2d 32 (2023).

[8] *County of Cedar v. Thelen*, 305 Neb. 351, 940 N.W.2d 521 (2020).

[9] *Salem Grain Co. v. City of Falls City*, 302 Neb. 548, 924 N.W.2d 678 (2019).

[10] *Cattle Nat. Bank & Trust Co. v. Watson*, 293 Neb. 943, 880 N.W.2d 906 (2016).

[11] Brief for appellants at 6.

it has jurisdiction over the matter before it.[12] The Riddles do not say so, but the premise of their first assignment of error is that the district court lacked subject matter jurisdiction to decide this case. Because of our duty, we must consider our jurisdiction.

[7,8] Subject matter jurisdiction is the power of a tribunal to hear and determine a case in the general class or category to which the proceedings in question belong and to deal with the general subject matter involved.[13] Where a lower court lacks subject matter jurisdiction to adjudicate the merits of a claim, issue, or question, an appellate court also lacks the power to determine the merits of the claim, issue, or question presented to the lower court.[14] Thus, in order to determine that we have jurisdiction to review the merits of the ACPA claim on appeal, we must first determine whether the district court had subject matter jurisdiction to decide an ACPA action. We conclude that it did.

The ACPA is a relatively new addition to the federal Lanham Act,[15] also known as the Trademark Act of 1946.[16] The Lanham Act contains a specific provision[17] vesting the federal courts with original jurisdiction "of all actions arising under" that act. The question underlying the Riddles' assignment of error is whether the state courts are vested with concurrent jurisdiction to decide "actions arising under" the Lanham Act, which we consider as a matter of first impression in this state.

---

[12] *Ramaekers v. Creighton University*, 312 Neb. 248, 978 N.W.2d 298 (2022).

[13] *Bleich v. Bleich*, 312 Neb. 962, 981 N.W.2d 801 (2022).

[14] *Heist v. Nebraska Dept. of Corr. Servs.*, 312 Neb. 480, 979 N.W.2d 772 (2022).

[15] See 15 U.S.C. § 1051 et seq. (2018).

[16] See Pub. L. No. 79-849, 60 Stat. 427.

[17] See § 1121.

We turn to the U.S. Supreme Court's precedent for guidance. The Court has instructed that "[i]n cases 'arising under' federal law, . . . there is a 'deeply rooted presumption in favor of concurrent state court jurisdiction,' rebuttable if 'Congress affirmatively ousts the state courts of jurisdiction over a particular federal claim.'"[18] It has further instructed that "the mere grant of jurisdiction to a federal court does not operate to oust a state court from concurrent jurisdiction."[19] Thus, the Lanham Act provision granting the federal courts jurisdiction is not dispositive.

[9] Seeing nothing that affirmatively ousts the state courts of jurisdiction over claims arising under the Lanham Act, we hold that the federal and state courts have concurrent jurisdiction. Several federal and state courts have reached a similar conclusion.[20] Accordingly, we conclude that the district court had jurisdiction to decide Charter West's ACPA claim, and this court has jurisdiction to review its merits on appeal.

## 2. ACPA Protection

The Riddles' next assignment of error challenges the district court's finding that Charter West qualified for protection under the ACPA. Before addressing the Riddles' specific arguments, we review the statutory elements of a cybersquatting claim set forth in the ACPA.

---

[18] *Mims v. Arrow Financial Services, LLC*, 565 U.S. 368, 378, 132 S. Ct. 740, 181 L. Ed. 2d 881 (2012) (quoting *Tafflin v. Levitt*, 493 U.S. 455, 110 S. Ct. 792, 107 L. Ed. 2d 887 (1990)).

[19] *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 479, 101 S. Ct. 2870, 69 L. Ed. 2d 784 (1981).

[20] See, e.g., *Verizon Communications v. Inverizon Intern., Inc.*, 295 F.3d 870 (8th Cir. 2002); *Aquatherm Industries, Inc. v. Fla. Power & Light Co.*, 84 F.3d 1388 (11th Cir. 1996); *Berlitz Schools of Languages, Etc. v. Everest House*, 619 F.2d 211 (2d Cir. 1980); *Burris Carpet Plus, Inc. v. Burris*, 785 N.W.2d 164 (N.D. 2010); *Pioneer First Fed. S. & L. v. Pioneer Nat. Bank*, 98 Wash. 2d 853, 659 P.2d 481 (1983).

(a) Elements of Cybersquatting

Subparagraph (1)(A)[21] of the ACPA provides, in relevant part:

> A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person—
>
> (i) has a bad faith intent to profit from that mark . . . ; and
>
> (ii) registers, traffics in, or uses a domain name that—
>
> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
>
> (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
>
> (III) is a trademark, word, or name protected by reason of section 706 of Title 18[22] or section 220506 of Title 36.[23]

[10] For ease of application, we set forth the elements of an ACPA claim. Generally, to prevail in a cybersquatting claim under the ACPA, a plaintiff must show (1) it owned a mark[24]; (2) its mark was distinctive or famous at the time of registration of the defendant's domain name[25]; (3) the defendant

---

[21] § 1125(d)(1)(A).

[22] 18 U.S.C. § 706 (2018) (protecting American National Red Cross).

[23] 36 U.S.C. § 220506 (Supp. III 2021) (protecting International Olympic Committee, International Paralympic Committee, Pan-American Sports Organization, and United States Olympic and Paralympic Committee).

[24] See § 1127 (defining "mark" for purposes of Lanham Act as "any trademark, service mark, collective mark, or certification mark").

[25] See *id.* (defining "domain name" as "any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet").

registered, trafficked in, or used the domain name; (4) the defendant's domain name was identical or confusingly similar to, or in the case of a famous mark, dilutive of, the plaintiff's mark; and (5) the defendant had a bad faith intent to profit.[26] This articulation disregards § 1125(d)(1)(A)(ii)(III), which has no application here and applies to the marks of only a few specific entities.

In the next section, we address the Riddles' arguments regarding Charter West's mark.

It is important to note that the evidence does not establish what Charter West claims its mark to be. At trial, it produced a list of domain names that it owned, but its *domain names* are not its *mark* for purposes of this analysis.[27] The only evidence of Charter West's mark seems to be its legal name—"Charter West Bank." Thus, in addressing the Riddles' arguments, we consider that to be its mark.

### (b) Resolution

### *(i) Ownership of Mark*

Under the first element, the Riddles argue that "'Charterwestbank' is not a registered trademark, [and] therefore, Charter[ W]est has no explicit rights to the term . . . ."[28] We reject this argument, which derives from a separate cause of action[29] under the Lanham Act. Even assuming that Charter West did not record its legal name as a registered mark, the U.S. Supreme Court has stated that protection

---

[26] See, § 1125(d)(1)(A)(i) and (ii); *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201 (6th Cir. 2004); *Carr v. Mississippi Lottery Corp.*, 350 So. 3d 1068 (Miss. 2022).

[27] Cf. *Coca-Cola Co. v. Purdy*, 382 F.3d 774 (8th Cir. 2004).

[28] Brief for appellants at 24.

[29] See § 1114(1)(a) (trademark infringement related to use of registered mark in manner "likely to cause confusion, or to cause mistake, or to deceive" consumers).

under the ACPA is not limited to registered marks.[30] This argument lacks merit.

### *(ii) Distinctive or Famous Mark*

Turning to the second element, the Riddles argue that Charter West's name "is not distinctively famous enough" to qualify for protection.[31] But this precise argument is inconsistent with the statutory language. As set forth above, subparagraph (1)(A) of the ACPA requires "a mark that is distinctive" *or* "a famous mark."[32] There is no requirement under the ACPA that Charter West's mark needed to be both "distinctive" *and* "famous" to qualify for protection.[33]

But we understand the Riddles' argument to assert more broadly that Charter West's mark is neither "distinctive" nor "famous," which requires that we determine the meaning of these two terms. The ACPA directs us to a separate subsection[34] of the Lanham Act for the statutory definitions.

Although that subsection does not explicitly define the term "distinctive," it provides that a mark may be distinctive "inherently or through acquired distinctiveness."[35] It defines the term "famous" as "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."[36] It further provides:

---

[30] See *Matal v. Tam*, 582 U.S. 218, 137 S. Ct. 1744, 198 L. Ed. 2d 366 (2017) (citing 5 J. Thomas McCarthy, Trademarks and Unfair Competition § 25A:49 (4th ed. 2017)).

[31] Brief for appellants at 25.

[32] § 1125(d)(1)(A)(ii)(I) and (II).

[33] See, generally, 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25A:50 (5th ed. 2023).

[34] § 1125(c).

[35] See § 1125(c)(1).

[36] § 1125(c)(2)(A).

In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:

(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.[37]

In its judgment and amended judgment, the district court did not specify whether it found Charter West owned "a mark that is distinctive" or "a famous mark." But, having determined that the Riddles violated the ACPA, it at least implicitly found that this element was satisfied.

As noted above, our standard of review requires that we review the district court's finding de novo on the record and reach an independent conclusion.[38] We cannot conclude from the record before us that Charter West met its burden of proof on this element.

[11] Charter West's only assertion of record directed to this element appears to be an allegation in its complaint, which set forth its legal name and the locations of its offices. During the preliminary injunction hearing, Charter West asked the district court to take judicial notice of its complaint, but that does not mean that the allegation is considered evidence. We have previously stated that evidence consists of facts admitted at a trial to establish or disprove the truth of allegations put in issue by the pleadings.[39]

---

[37] § 1125(c)(2)(A)(i) through (iv).

[38] See *Salem Grain Co. v. City of Falls City, supra* note 9.

[39] *Kimball v. Nebraska Dept. of Motor Vehicles*, 255 Neb. 430, 586 N.W.2d 439 (1998).

We review the evidence actually adduced at trial. Charter West offered three exhibits that it originally attached to its complaint, which included a list of domain names owned by Charter West, a series of emails, and the content displayed on the website. It reintroduced the exhibits received by the court at the preliminary injunction hearing, which showed further email correspondence between the parties. It also offered a transcript from the preliminary injunction hearing, an email exchange that occurred after the preliminary injunction was issued, and the Eighth Circuit's decision in the federal case.

Viewing the evidence as a whole, we determine that it did not demonstrate that Charter West's mark was "distinctive" at the time of registration of the Riddles' domain name. The U.S. Supreme Court has explained that "[m]arks are often classified in categories of generally increasing distinctiveness; . . . they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful."[40] "The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection."[41] "In contrast, generic marks—those that 'refe[r] to the genus of which the particular product is a species' . . . are not registrable as trademarks."[42]

It has explained:

> Marks which are merely descriptive of a product are not inherently distinctive. When used to describe a product, they do not inherently identify a particular source, and hence cannot be protected. However, descriptive marks may acquire the distinctiveness which will allow them to be protected under the [Lanham] Act. . . . [T]he Lanham Act provides that a descriptive mark

---

[40] *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992).

[41] *Id.*

[42] *Id.* (quoting *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 105 S. Ct. 658, 83 L. Ed. 2d 582 (1985)).

that otherwise could not be registered under the Act may be registered if it "has become distinctive of the applicant's goods in commerce."[43] This acquired distinctiveness is generally called "secondary meaning."[44] In summary, "The general rule regarding distinctiveness is clear: An identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning."[45]

We analyze Charter West's mark under this framework. The word "bank" is a generic term incapable of protection by itself.[46] The words "charter"[47] and "west"[48] are, at most, merely descriptive terms that are not inherently distinctive.[49] One court, applying a portion of the Lanham Act, rejected characterizing the term "charter," with respect to banking services, as suggestive and leaned instead toward describing it as generic, but for purposes of analysis assumed that it was descriptive.[50]

---

[43] § 1052(f).

[44] *Two Pesos, Inc. v. Taco Cabana, Inc., supra* note 40, 505 U.S. at 769.

[45] *Id.* (emphasis in original).

[46] See *First Savings Bank, F.S.B. v. First Bank System*, 101 F.3d 645 (10th Cir. 1996); *Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785 (5th Cir. 1984). See, also, Neb. Rev. Stat. § 8-113 (Reissue 2022).

[47] See, generally, "Charter," Oxford English Dictionary Online, https://www.oed.com/view/Entry/30814 (last visited May 2, 2023) ("[a] leaf of paper . . . ; a legal document or 'deed' written (usually) upon a single sheet of paper, parchment, or other material, by which grants, cessions, contracts, and other transactions are confirmed and ratified").

[48] See, generally, "West," Oxford English Dictionary Online, https://www.oed.com/view/Entry/227885 (last visited May 2, 2023) ("[d]esignating the western part of a country, region, town, etc., or the more westerly of two regions, etc., with the same name").

[49] See 2 McCarthy, *supra* note 33, § 14:1 (geographically descriptive terms require secondary meaning).

[50] See *Charter Nat. Bank and Trust v. Charter One Financial, Inc.*, No. 01 C 0905, 2001 WL 1035721 (N.D. Ill. 2001) (no reasonable likelihood of success that term "charter" acquired secondary meaning).

Here, absent proof of "acquired distinctiveness through secondary meaning," these terms, standing alone, would not be subject to protection. Seeing no evidence in the record establishing secondary meaning, we find that Charter West failed to show its mark was "distinctive."

Likewise, we determine that the evidence failed to demonstrate Charter West's mark was "famous" at the time of registration of the Riddles' domain name. Charter West's evidence of record does not show the "duration, extent, and geographic reach of advertising and publicity of [its] mark"; the "amount, volume, and geographic extent of sales of goods or services offered under [its] mark"; or the "extent of actual recognition of [its] mark." Nor does the evidence show "[its] mark was registered."

Although we recognize that those examples were not the only means by which Charter West could have satisfied its burden of proof, it needed to produce *some* evidence demonstrating that its mark was either "distinctive" or "famous" at the time of registration of the Riddles' domain name in order to prevail on its claim.[51] Upon our de novo review of the record, it has failed to do so.

Both Charter West's briefing and oral argument suggest that it did not believe the ACPA required it to prove it had a "mark" that was either "distinctive" or "famous." Its appellate brief stated, "In order to violate the [ACPA], [the Riddles] must be using or trafficking in the offending domain name, must be using the name in bad faith with intent to profit and must be using a domain that contains a mark that is confusingly similar to the owner's mark."[52] But this articulation overlooks the language of § 1125(d)(1)(A)(ii)(I) and (II), which, in order to qualify for protection, requires that

---

[51] See § 1125(d)(1)(A)(ii)(I) and (II).

[52] Brief for appellee at 6.

Charter West's mark was "distinctive" or "famous" at the time of registration of the Riddles' domain name. And at oral argument, in further response to a question whether it "concede[d] that there's no evidence in the record of a famous or distinctive mark," it responded that it "d[idn't] have anything that indicates that it's famous. . . . Or distinctive." Then, in response to a question whether "those [are] requirements to proceed under the [ACPA]," Charter West stated, "I don't think they are. I think if you talk about—if you look at the [ACPA], it does not require you to have a trademark or it does not require you to have a specific distinctive, famous, or whatever adjective you want to add, to the word." But contrary to Charter West's written and verbal argument, the ACPA imposes this requirement.

Because our de novo review of the record leads to the conclusion that Charter West failed to prove its mark was "distinctive" or "famous" at the time of registration of the Riddles' domain name, it did not qualify for protection under the ACPA. Accordingly, the record does not support the district court's implicit finding that Charter West met its burden of proof on this element. Nor does the record support the court's permanent injunction barring the Riddles from using the website or any other domain name containing the words "charter west." We therefore must reverse its judgment and vacate its injunction.

[12] In light of our conclusion, we need not reach the Riddles' remaining assignments of error. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[53]

## VI. CONCLUSION

Because we have determined that Charter West failed to produce evidence showing it was entitled to protection

---

[53] *Avis Rent A Car Sys. v. McDavid*, 313 Neb. 479, 984 N.W.2d 632 (2023).

under the ACPA, we conclude that the district court erred in granting judgment against the Riddles for cybersquatting. The judgment of the district court is hereby reversed, its injunction is vacated, and the action is dismissed.

REVERSED, INJUNCTION VACATED, AND DISMISSED.