IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

TALL GRASS HILLS V. OVERHOLT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

TALL GRASS HILLS, L.L.C., APPELLEE,

V.

RANDY L. OVERHOLT AND STACEY OVERHOLT, APPELLANTS,

Filed May 7, 2024.    No. A-23-114.

Appeal from the District Court for Lancaster County: SUSAN I. STRONG, Judge. Affirmed.

Ryan K. McIntosh, of Brandt, Horan, Hallstrom & Stilmock, for appellants.

Robert S. Lannin and J. Michael Hannon, of Baylor, Evnen, Wolfe & Tannehill, L.L.P., and Robert L. Bryant, of Cada, Cada, & Jewson, for appellee.

PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Randy L. and Stacey Overholt appeal the order of the Lancaster County District Court granting injunctive relief and damages to Tall Grass Hills, L.L.C. (TGH) caused by the Overholts' construction of a sediment pond and dam. The Overholts identify numerous assignments of error relating to the district court's findings in favor of TGH and against their requests for relief. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

This appeal involves neighboring Lancaster County, Nebraska, property owners - the Overholts and TGH. The Overholts' property is located immediately north of TGH's property. Both properties are bordered on the east by Southwest 98th Street.

- 1 -

The Overholts purchased their 20-acre property in 2000 and have resided thereon since that time. In February 2017, the Overholts built a pond in the northeast corner of their property to raise organic catfish. Although the main source of water for the catfish pond is an artesian well, it also receives runoff from other areas of the Overholt property, the TGH property, and several other properties.

In 2016, Jim Luers and John Rallis formed TGH for the purpose of purchasing the TGH property, which was agricultural, with the intent of eventually developing the property into acreages. TGH hired an engineering firm to create the initial plans for the development of its property and obtained a community unit plan which Luers stated was "a rural development that is designed to try to keep most of the property in a rural nature." According to Luers, they "planned five acreages . . . each about three to five acres, and the community unit plan required that approximately 70 percent of that 80 acres had to remain in unbuildable land, so it couldn't be part of a sale for a residential property."

In 2017 or 2018, after learning that TGH had purchased the TGH property, and anticipating TGH's development of the property, the Overholts decided to build a sediment pond. According to Overholt, the construction of the sediment pond was "[a] protection mechanism, to protect what I've worked hard for and wasn't going to let somebody . . . destroy something I've worked so hard for." The purpose of a sediment pond was to allow water to flow in and slow down in order to allow sediment to settle before flowing out thereby preventing or reducing the amount of silt and runoff going into their catfish pond.

To help them create and install the sediment pond, the Overholts contacted Pat Thomas, the owner of Pat Thomas Construction, Inc. Thomas assisted the Overholts in determining the size, location, and dimensions of the sediment pond. Thereafter, the Overholts, with Thomas' assistance, constructed the sediment pond and dam next to the property line dividing the Overholt and TGH properties. The dimensions of the sediment pond were approximately 150' x 200' with maximum depths ranging from 4 to 5 feet below the top of the outlet culverts. The size of the sediment pond was limited by the size and layout of the Overholts' property. The sediment basin had two 24-inch culverts for outflow from the sediment basin which, according to Thomas, was "really what we could afford." The culverts were placed at an elevation of 18 inches to 24 inches above the lowest elevation between the two properties. Overholt testified that he did not obtain any permits prior to constructing the catfish pond and the sediment pond and did not perform any surface water runoff calculations.

Even though the sediment basin did not initially fill up with water, TGH experienced drainage issues on its property immediately following the building of the sediment pond and dam. Water began backing up along the tree line of the northern portion of TGH's property bordering the Overholts' property. This backup of water reduced TGH's farmland and prevented TGH from accessing the western portion of its property.

2. CURRENT LITIGATION

In May 2019, TGH filed a complaint for a mandatory injunction against the Overholts which complaint was later amended. TGH's operative complaint asserted four theories of recovery

related to the sediment basin installed by the Overholts including injunctive relief, nuisance, trespass, and negligence.

The Overholts filed an answer and counterclaim which was later amended. The Overholts' operative answer asserted five affirmative defenses: failure to state a claim upon which relief could be granted; contributory negligence; unclean hands; estoppel; and mitigation of damages. The Overholts' operative counterclaim sought relief for TGH's development of its property under seven theories of recovery: determination of boundaries, quiet title, adverse possession, drainage, nuisance, trespass, and negligence.

Later in the litigation, TGH filed a third party complaint against Pat Thomas Construction, Inc. and Pat Thomas, individually, for consulting, design, and construction services provided to the Overholts relating to the sediment pond which "caused or contributed to the alleged damages asserted by the Overholts against [TGH]."

### 3. CONSTRUCTION OF TGH'S FENCE AND ACCESS ROAD

Because TGH believed Overholt was using a portion of TGH's property to access the southern half of the Overholt property, and following Overholt's act of cutting down some bushes and trees in that area, TGH had a survey completed and installed a fence. Also, due to a lack of access to the northeast portion of TGH's property, allegedly caused by water backing up in that area, TGH began constructing an access road in April 2020. Prior to constructing the access road, TGH engaged multiple engineering firms, sought and received approval from the Lancaster County Planning Commission, and hired a construction contractor to complete the project.

After TGH installed the fence and started building the access road, Overholt "moved his fence south and blocked some of [TGH's] ability to build our road connecting it to Southwest 98th Street." Luers testified that the construction of the road was delayed when Overholt

> moved his fence further south . . . causing us to have to re-design the end of our road . . . as it made contact with Southwest 98th Street. We had to move it south because [Overholt] had put a fence up and he parked his vehicle there . . . and rather than stop construction at that point in time, I filed a County Court case, but went ahead and . . . moved the road about . . . 10 to 15 feet south . . .

The county court case filed by TGH alleged trespass by the Overholts on TGH's property based on the Overholts' removal of TGH's boundary fence and their confiscation of wooden and metal posts; removal of small trees, shrubs, and "no trespass" signs; and installation of a gate and fence on TGH's property. The complaint also alleged that the Overholts parked a vehicle on TGH's property "in an attempt to obstruct [TGH's] planned construction of a road, as approved by the Lancaster County Board."

The Lancaster County Court's order acknowledged that it was aware of the litigation pending in Lancaster County District Court concerning the TGH and the Overholt properties. The county court also acknowledged that "[e]vidence was also presented to this Court suggesting that there has been uncertainty in the past as to the property line, as well as some historical evidence of past fencing and markings contrary to the 2018 surveyed property line." The court further found that when "Overholt erected the disputed portion of fence in late April 2020, he knowingly and

intentionally placed a structure beyond the 'pink flag,' which is the stipulated location of the surveyed property line established in January 2018 between [TGH's] property and the [Overholts'] property." The county court found that the continued presence of the fence installed by the Overholts constituted a willful trespass "entitling [TGH] to remove the fence structure erected on [TGH's] property by . . . Overholt." TGH's contractor removed the fence.

### 4. COMPLETION OF ACCESS ROAD AND RAINSTORM EVENT

TGH's access road was completed on May 16, 2020, and no further construction or development of TGH's property occurred after that date. However, TGH continued implementing erosion and sediment control measures such as seeding, wattles, straw mats, and silt fences, as late as June 2021. Wattles are "a device that creates a dam. It creates an area that the water has to hit against before it overflows it, kind of a way to control velocity, control the silt as it's going down."

On May 23, 2020, a significant rainstorm event occurred during which 2.5 to 3 inches of rain fell in a very short period of time. TGH claims that this rainstorm event caused severe flooding of its property. The Overholts claim that this rain event caused excess sediment to enter their catfish pond causing them damage and was the basis for their counterclaims of negligence, nuisance, and trespass against TGH.

### 5. OVERHOLT'S MOTION TO DISQUALIFY EXPERT WITNESS

Prior to trial, the Overholts filed a motion to disqualify one of TGH's expert witnesses, Dale Softley. TGH hired Softley, an agronomist, to determine why trees on TGH's property were dying and to determine the value of those trees. The Overholts' motion to disqualify provided that

Softley's report and subsequent deposition fail to draw any conclusions of sufficient certainty to submit to a jury, or this Court, pursuant to the minimum standards for expert testimony applied in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) and adopted by the Nebraska courts in *Schafersman v. Agland Coop.*, 262 Neb. 215 (2001). To the extent . . . Softley's report and depositions testimony does draw any conclusions, those conclusions are limited and speculative. . . . Softley's report and testimony is based on no scientific method, and he lacks the necessary training or education to provide any expert opinion evidence in this matter. Further, he has no qualifications to act as a purported appraiser of trees.

The court denied the Overholts' motion to disqualify Softley stating:

The Court finds that Softley clearly possesses specialized knowledge of the subject matter of agronomy which is "so superior to that of persons in general as to make his formation of a judgment a fact of probative value." *Gonzales*[ *v. Nebraska Pediatric Practice*], 26 Neb. App. [764,] 790[, 923 N.W.2d 445, 463 (2019)]. Pertinent to this case, Softley has specialized knowledge of various and potential causes of damage to trees and shrubs in the community; and due to his inspection, he may have specific knowledge concerning damage to the trees and shrubs on [TGH's] land. Although Softley may not have formal education and training specific to the valuation of trees and shrubs, [the Overholts] will have the opportunity to object to his testimony and point out any

- 4 -

deficiencies on cross-examination. If the [Overholts] have a more specialized expert to attack Softley's opinions and conclusions, they may call their own expert to testify. The Court finds that Softley is qualified to testify as an expert concerning his knowledge regarding trees and shrubs based on his education, training and experience.

. . . .

Softley's deposition testimony indicates that some of his opinions, particularly regarding the replacement value of the trees and shrubs on the property, may be lacking in reliability. However, the Court finds that he is qualified as an expert witness in agronomy; and that his testimony is not known to the general public, is relevant to the issues in this case, and may aid the trier of fact, in this case, the Court, in determining the questions of fact to be resolved at trial. [The Overholts] will have an opportunity to object and question Softley's opinions and conclusions on cross-examination and can call their own expert witness if they so choose.

### 6. TRIAL

The bench trial in this matter was held over 3 days in October 2022. Witnesses for TGH included: James Luers and John Rallis, the owners of TGH; Tanner Goes, TGH's tenant who farmed a portion of its property; and TGH's expert witnesses Dale Softley, an agronomist; Timothy Farmer, a civil engineer; and Francis Kwapnioski, a civil engineer. Witnesses for the Overholts included Overholt and expert witnesses Dr. Robert Kalinski, a professional engineer and geologist; Karen Brightenburg, a licensed land surveyor; and Mark Pomajzl, a former inspector with the Nebraska Department of Environment and Energy (DEE).

### (a) Evidence Regarding Fence Line

Overholt testified that he believed that the boundary line of the property was the fence line consisting of steel posts, wood posts, and wires; that the fence was present when he purchased his property in 2000; and that he has always treated the fence line as the property line. According to Overholt, the previous owner of TGH's property never crossed over to the north side of the fence line and put up "Keep Out" signs on his side of the fence line. He further testified that he had an indication from the previous owner of TGH's property that the fence line was the property line. However, Leurs testified that when TGH purchased its property in 2016, there was no clearly defined property line between the TGH property and the Overholts' property.

Karen Brightenburg, a licensed land surveyor, testified on behalf of the Overholts. The Overholts hired Brightenburg to survey the boundary line between the Overholts and TGH's properties in relation to the fence line. During the survey, Brightenburg located the existing property corners and mapped the platted survey property line and the fence line. Brightenburg determined the fence line was denoted by metal and wood fence posts which ran continuously throughout the property. However, Brightenburg noted that for a portion of the fence line, there were areas of overgrowth where there was no maintenance on either side of the fence and that there was "maybe a quarter of the property line" without a discernable fence. She further testified

that the fence was not wired throughout but "was off and on wired" and that, "quite often, the wire was on the ground, as happens when fences get old" and are not maintained.

### (b) Expert Witnesses

The parties introduced evidence through several expert witnesses. TGH adduced testimony from Dale Softley, a certified professional agronomist; Francis Kwapnioski, a civil engineer and expert in water resources or hydrology; and Timothy Farmer, a civil engineer.

The Overholts presented testimony from expert witnesses including Dr. Robert Kalinski, a professional engineer and geologist; and Mark Pomajzl, a former inspector with DEE.

### (i) TGH Expert Witnesses

### a. Dale Softley

Softley, an agronomist, testified that TGH hired him in 2021 to determine why trees on TGH's property were dying and to determine the value of those trees. After observing the dead and dying trees on TGH's property, Softley authored a report which stated that there were "at least 15" dead or dying trees on TGH's property; however, at trial Softley testified that there "could easily be 20, 25 trees . . . that [were] at various states of decline." Softley testified that there were "several options" of what could cause the trees' decline. According to Softley, the trees were located "on the north edge" of TGH's property by "an old, old fence line . . . which I'm sure is the property line, which would be just south of the retaining dam." Softley testified that the flooding on TGH's property "was contributing to [the trees'] decline. And every time they get wet, it's going to hurt them more and more." He also opined that, if a tree is submerged for a long period of time, it will kill the tree, but he could not say with certainty that any of the trees would die in the next 5 years as a result of being inundated with water. He further could not determine with certainty the cause of death of any of the trees.

Softley's May 27, 2021, report stated, in part, and within a reasonable degree of agronomic science certainty, that the Overholts "constructed a reservoir and berm/dam causing surface water to back onto [TGH's property] resulting in water standing in the area identified in diagram #1" and that

> [w]hile inspecting the property, I identified at least 15 trees that I believe will die if continued flooding covers their roots for more than a few days as a time, and 6 or so plants in major decline or dead. . . . In this same area are several damaged plants ranging in varying degrees of decline from multiple reasons.

Softley concluded that, in his opinion, "if the flooding, and berm are left as is, the trees in this situation will die resulting from oxygen deprivation or drowning."

Softley also provided a supplemental expert disclosure and opinion in which he created a document listing 36 trees, their measurements, and the cost to replace them with landscape trees not including the cost of removal. Softley's report opined that replacement cost of trees would exceed $100,000. However, Softley admitted that the trees that he measured "were all living trees."

b. Timothy Farmer

TGH's second expert witness was Timothy Farmer, a civil engineer. Farmer testified that he was hired to complete the access road project and "to go out and do some survey on the adjacent property and on [TGH's] property, to determine if the sedimentation pond on the property to the north of [TGH] was potentially backing water up onto [TGH's] property." Farmer testified that the entrance to TGH's property was shifted from 98th Street further south in order to "make sure that we were clear . . . of the north property line." Farmer also increased the size of the two culverts under the access road from 36 inches to 48 inches. Farmer testified that, based upon his education, experience and training, he

> arrived at the conclusion that when water was in the pond to the elevation of the outlet pipes, the pond water would back up on to [TGH's] property. And, in the event of a larger storm, when those two pipes couldn't handle the drainage and the water got up to the elevation of the dam, it would back up even further onto [TGH's property].

Farmer noted that the high elevation of the Overholts' overflow pipes caused the backup of water because the sediment pond "will hold water until it's to the elevation of the pipe. So water will naturally level out. And when it levels out back to the south, it crosses the property line and goes onto [TGH's property] until it can go through those relief pipes." Farmer stated that although there had not been any structural damage to TGH's access road at the time of trial, the water backing up onto TGH's property from the Overholts' property could, over time, potentially damage TGH's access road if water continued backing up into the sub-grade of that road. According to Farmer, the problem could be resolved "[e]ither through a redesign of that sedimentation pond or lowering the pipes in the sedimentation pond to an elevation that wouldn't back water up onto the property to the south." Farmer stated that the elevation of the pipes needed to be approximately 18 inches lower than its present elevation.

In May 2020, following a survey of the Overholt's dam, Farmer issued a report which stated, in part:

> We would propose that the sedimentation pond be reconfigured to lower the pipes through it to make sure water does not back up onto [TGH's property] during normal flows. We would also request the hydraulic study that was used to determine the size of the pipes and height of the dam for our review to verify . . . the frequency at which the pond is [at] full capacity. Failure to conduct such studies before building the dam and pond would constitute failure to exercise reasonable due care by . . . Overholt. We also hold the following opinions to a reasonable degree of engineering certainty:
> 1. Diffuse surface water has been historically concentrated in volume and velocity into a natural depression over and across [TGH's] property and onto the Overholts' property, and the Overholts have obstructed the same, failing to reasonably allow the natural drainage of the water off of [TGH's] property.
> 2. [The] Overholts failed to use reasonable care in the construction of the pond and dam in that it allows surface water to be obstructed and diverted to and upon [TGH's] property by as much as 200 feet in some areas.

3. [The Overholts'] obstruction of the natural drainage of the natural depression and surface water and the resulting back up of water on [TGH's] property, if not remedied, will cause continuing and irreparable harm to [TGH's] land, trees, and roadway.

4. In order to eliminate the water backing up upon [TGH's] property, the Overholts' drainage culvert out of the pond would need to be lowered by at least 1.5 feet, making sure that the culverts themselves were large enough to properly drain all excess surface water.

### c. Francis Kwapnioski

TGH's third expert witness was Francis Kwapnioski, a civil engineer specializing in water resources. Kwapnioski consults regarding a variety of water resources related engineering including flow routing, flood routing, and water management. According to Kwapnioski, he visited TGH's property multiple times. He described TGH's property as about 40 acres of rolling Nebraska land with various types of vegetation and a pronounced drainage area that is defined by trees and contour elevations. Drainage flows south to north through TGH's property across the Overholts' property and along Southwest 98th Street. Kwapnioski testified that, based upon his experience and education, the watercourse and drainage area on TGH's property is a natural and historic watercourse which is concentrated in a natural depression or swale which is at least 2 feet below most of the surrounding land. Kwapnioski explained that an exhibit depicting an excerpt from a U.S. Fish and Wildlife national wetlands inventory indicated the existence of a freshwater forest shrub wetland by the line delineating the wetland area through the trees and through the sediment pond. Kwapnioski stated that, generally, the purpose of the three culverts located on TGH's property was to "maintain the historic drainage pattern across the road, so it doesn't create a barrier to normal runoff events" and to allow the water to flow in a similar manner as it had historically done.

Regarding the Overholt's sediment pond and dam, he testified that

the dike area starts just to the west of 98th Street, and proceeds essentially due west to kind of the area of the primary natural drain, where there's another more pronounced structure that . . . is built to cut off the flow through the primary historic drainage area, and then abuts into the embankment there to the west, the west abutment of the natural drain there.

In order to make calculations regarding drainage, Kwapnioski

looked at the area . . . then looked to see where the water would be coming from and the routes it might take to accumulate into the primary drainage. And I observed the elevations and the contours. I utilized contour maps to identify the high areas, and connected the high points around the area that encompass the draining basin, to quantify the areas.

According to Kwapnioski, the Overholts' construction of the sediment pond

captures runoff from other areas that would have bypassed that area had the pond and dike not been built. So . . . by building the pond and the dike, it took additional runoff from other areas and concentrated them into the . . . sediment pond, therefore increasing the amount of water flowing in . . . that general area.

Kwapnioski testified that the Overholts' construction of the sediment pond and dam

> prevent[s] the free flow of water through the drainage course, and reduce[s] its flow volume in the initial sediment pond to the capacity of [the Overholts'] 24-inch [culverts], as the water level fills them. And it also obstructs the flow through the catfish pond by the same mechanism. These are essentially dikes that go across the full length of the drainage to the elevation they're built, and contain and reduce the flow of water by that dike, and only allow the amount that would be possible to pass through the [culverts].

TGH also asked Kwapnioski to review the work and report of the Overholts' expert witness Dr. Kalinski. Kwapnioski testified that Kalinski's calculation of 67 acres of drainage from TGH's property to the Overholt property was incorrect and that, actually, there were 63 acres of drainage with the runoff from TGH's property accounting for what was approximately 32 acres and with the remaining 31 acres coming from different adjacent properties. Kwapnioski also opined that that Overholts' sediment pond captures runoff from areas that do not pass through TGH's culverts and that this "wouldn't have occurred . . . prior to the construction of the sediment pond. It would have accumulated at a point downstream." The Overholts' construction of the sediment pond resulted in an increase in runoff from 63 acres to 87 acres, increased the runoff from TGH's property from 32 acres to 40 acres, and increased the capture of runoff from 31 acres to 42 acres. An additional 5 acres of runoff is generated from the Overholts' property due to the construction of the sediment pond. According to Kwapnioski, the capturing of additional acres due to the construction of the sediment pond and berm are significant "[b]ecause it adds to the volume of water that is captured and held within the sediment pond, and that increases the frequency that [the] water level would increase to a point where it would impact [TGH's] property, with either direct inundation or seeping in the . . . soil and vegetation.

Kwapnioski testified that, based upon his observations, in his professional opinion, THG's culverts are an appropriate size to handle historic water flow and that the culverts allow water to pass through efficiently but not with such force that erosion occurs at the discharge point. And, during his visits to TGH's property between June and October 2021, he did not observe any erosion. He further testified that although Kalinski opined that riprap, which is a mechanism for controlling erosion, was needed at the outlet of TGH's culverts, a riprap was not necessary because "there was really no apparent erosion occurring." He further opined that the backing up of water onto TGH's property was a result of the Overholts' construction of the sediment pond and berm and that the construction of the sediment pond diverted runoff water into the sediment pond that otherwise would have traveled north along 98th Street. Kwapnioski also opined that the Overholts' sediment pond is undersized in storage capacity and that the two 24-inch culverts are too small to handle the historic flow of water.

Finally, Kwapnioski opined that, based upon his education, training, and experience, and his analysis and review of the records, photos, and other documents in this case, the Overholts failed to exercise reasonable care in the construction of the sediment pond and dam. In his opinion, the sediment pond was too small, the two 24-inch culverts were insufficient to control the amount of water flow, and the sediment pond was not placed in an effective location. And "[b]ecause of

[the sediment pond's] location and the relative elevation and position of it, about the only effective thing that I could see would be to remove it."

A report by TGH's expert witness Kwapnioski refuted many of findings by the Overholts' expert Dr. Kalinski. In his October 2021 report, Kwapnioski stated, inter alia:

• It is my observation and professional opinion that a significant amount of the content identified, presented and focused on in Kalinski's report is inaccurate and misleading.

• It is my assessment and professional opinion that prior to [TGH's] development the area providing runoff to the Overholt property, including sources other than TGH, was and currently is greater than the 67.9 acres quantified in Kalinski's report at page 2.

• It is my observation and professional opinion that construction of the Overholt sediment pond obstructs water flow in a natural watercourse and can, did and will back . . . water up onto [TGH's property]. . . .

• It is my observation and professional opinion that there is runoff presently being relocated and more water being accumulated, captured and ultimately backed up onto TGH during higher precipitation events, than had historically accumulated and flowed thru the main local drainage channel and off [TGH's property] above the location of the sediment pond.

. . . .

• In my professional opinion[,] construction of the sediment pond creates issues for TGH similar to the inundation and saturation concerns raised by Lancaster County due to the Overholt[s'] construction of the catfish pond.

• It is my professional opinion that the current condition, where traditional and additional runoff water is backed up onto [TGH's property], impedes property use and caused, and will cause, other damages, such as further access restriction, vegetation loss, undesirable sediment, and trash deposition, on [TGH's property.] . . .

• It is my professional opinion that, counter to Kalinski, both the Overholt[s'] sediment pond and catfish pond have and previously had significant sources of runoff and sediment inflow, including directly from the Overholt property and other runoff, not associated with TGH or its road construction project. . . .

. . . .

• From my experience and in my professional opinion the sediment concentration in the catfish pond will increase to some degree, in response to a rainfall the magnitude of the 5/23/2020 event, regardless of the construction of [TGH's access road.]

• In my professional opinion, the TGH turbidity increase concern, raised in the Kalinski report, is not properly quantified or scientifically supported.

• From this assessment and my experience and training it is my professional opinion that nothing short of sediment pond removal will effectively preclude the obstruction and associated damage causing backing up of runoff water onto [TGH's property.]

Kwapnioski's report further noted that:

Not all runoff entering the main water course above the Overholt sediment pond originates on [TGH's property.] Of the approximately 87 acres of total watershed contributing to sediment pond of inflow, approximately 5 acres (6%) of runoff is generated

- 10 -

directly on the [Overholts'] property. Another approximately 42 acres (48%) of runoff originates on other lands, including SW 98th Street right-of-way, abutting and directly east and south of the TGH property. This leaves approximately 40 acres (46%) of TGH outflow solely generated on [TGH's property] and contributing to sediment pond inflow. Of this total 40 acres, only about 33 acres (38%) now and historically contributed runoff to the [Overholts'] property, thru the main discharge channel as indicated by the twin 48" round equivalent CMPs [corrugated metal pipes].

Construction of the Overholt sediment pond directly increased the drainage area of the primary local waterway, at the point of the berm, by about 23 acres (37%) and because of this has increased the amount of water and sediment runoff captured and backed up by the sediment pond, relative to preconstruction runoff.

Only about 64 acres (74%) of the total 87 acres of sediment pond inflow accumulates above and is discharged through [TGH's] twin 48" round equivalent CMPs under the TGH roadway. Of this runoff area that discharges thru this twin 48" round equivalent CMP culvert system, about 33 acres (52%) are TGH and amount to only about 38% of the total sediment pond runoff area.

Kwapnioski also opined that the Overholts' two 24-inch culverts have "surprisingly inadequate discharge capacity" and that due to the sediment pond's "minimal storage capacity, as per Kalinski, the sediment pond is a material channel obstruction and potentially an overtopping and berm failure risk."

*(ii) Overholts' Expert Witnesses*

a. Dr. Robert Kalinski

The Overholts' first expert witness was Dr. Robert Kalinski, a civil engineer licensed in 11 states and a licensed geologist in Nebraska. Kalinski testified that, prior to the development of TGH's access road, after water flowed from TGH's property onto the Overholts' property, there was a flat diffused flow with no apparent 2-foot depressed areas or continuous channels, and that he had not seen any evidence that a channel of more than 2 feet existed on the Overholts' property. Further, on direct examination the following colloquy occurred between the Overholts' counsel and Kalinski:

Q Is there . . . any river, brook or stream that the water drains continuously into?

A There might be . . . some distance away. . . . I don't think there's one in the local area that it does.

Q Is there any natural channel of more than two feet in depth that carries water continuously into . . . any of those rivers or streams?

A From Overholt or from –

Q From the Overholt property.

A. Not continuous, no.

Kalinski stated that once the drainage reached the Overholts' property and flattened out, it did not match the criteria necessary to be considered a natural drainage way.

Further, Kalinski acknowledged that the size of the Overholts' sediment pond was minimal compared to the anticipated runoff for the size of TGH's subdivision. He further stated that after TGH's construction of their access road, the runoff that was a diffused flow is not concentrated through the two 48-inch culverts resulting in higher velocities. Kalinski further testified that the size of the Overholts' sediment pond did not require them to get a permit and the construction of the sediment pond and dam did not violate or fall below generally accepted standards. Kalinski calculated that the sediment pond was 135,000 cubic feet and that, based on the contributing basin and Natural Resources Conservation Service design criteria, the sediment pond should have been 302,000 cubic feet. However, he noted that the Overholts were "pretty limited in area and in depth" for their sediment pond and that some erosion was taking place at the outlet of the Overholts' culverts.

Kalinski also testified that he did not disagree with Kwapnioski's opinion that construction of TGH's access road only added approximately one acre of drainage to the area that is flowing through the culverts. However, he believed that the installation of TGH's access road and culverts changed the drainage and changed the velocity of the water entering the Overholts' property, which would increase the sediment flowing onto the Overholts' property. Although he did not have any issue with the sizing of the 48-inch culverts on TGH's property, he "question[ed] why there isn't protection provided for the water coming out of that, given its high velocity." However, he admitted that he had not inspected the culverts.

### b. Mark Pomajzl

Mark Pomajzl testified that he previously had been employed as a compliance inspector for the permits and compliance unit of DEE. Pomajzl testified that after performing an inspection or review and determining that there is a violation, DEE would send a notice of violation, later renamed a letter of noncompliance, to the owner of the site, notifying them of the violation and giving tasks to complete in order to regain compliance. TGH was issued notices of violation/letters of noncompliance in May, June, and December 2020.

The May 2020 notice of violation instructed TGH to immediately develop and implement a Storm Water Pollution Prevention Plan (SWPPP) and obtain coverage under the Construction Storm Water General Permit (CSW-GP).

In June 2020, DEE conducted a follow-up inspection of TGH's property in which a lack of erosion controls were identified. Following that inspection, DEE issued another notice of violation letter requesting, inter alia, that TGH immediately implement and maintain temporary or permanent stabilization measures for disturbed portions of the site as required by the CSW-GP, implement the required corrective actions for the best management practices installed to control storm water flow velocity, and take corrective action for the removal of offsite accumulations of sediment. By mid-July, TGH had installed some wattles in the north and south ditches and had begun seeding, but still needed to repair silt fences, install additional silt fencing, and install controls to reduce water velocity.

The third letter of noncompliance was issued in December 2020. In this letter, DEE requested that TGH implement and maintain temporary or permanent stabilization measures for

disturbed portions of the site as required by the CSW-GP and SWPPP, conform wattles to smooth surfaces along the contour at a uniform elevation, and repair and/or install erosion control blankets.

In June 2021, Pomajzl conducted another site visit of TGH's property. Pomajzl noted that TGH was not in compliance with certain requirements including improper installation of wattles, failure of silt fences, a lack of soil stabilization or temporary seeding in certain areas, and a lack of maintenance and/or a lack of velocity controls. Pomajzl admitted that he observed erosion during his visits to TGH's property on more than one occasion.

### (c) Evidence Regarding TGH's Damages

According to Luers, the Overholts' construction of the sediment pond and dam damaged TGH resulting in a reduction in rent income of $2,000 over two years due to flooding of their farmland. Additionally, TGH lost "a variety of trees. . . . that screened [TGH's] property from the Overholts' property" and had vehicles 'parked all over their property." The trees also provided a windbreak. Luers estimated that that TGH lost around 12 to 18 trees and that to remove the dead trees and replace them with comparable trees would cost approximately $2,000 to $2,500 per tree.

### 7. DISTRICT COURT ORDER

Following the bench trial, the district court granted TGH's request for injunctive relief requiring the Overholts to restore their property and awarded TGH $30,000 in damages related to TGH's trees plus $2,000 in lost rent, together with post judgment interest and costs. The court dismissed each of the Overholts' theories of recovery and dismissed TGH's third-party complaint as moot. After TGH filed a motion to amend the judgment to specify the amount of costs, the court amended the order to award TGH costs of $1,934.84. The Overholts have timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

On appeal, the Overholts have identified 15 assignments of error. These assignments of error can be placed into five categories: (1) denial of the motion to disqualify TGH's expert witness; (2) errors concerning the court's findings in favor of Tall Grass; (3) remedies granted to TGH; (4) errors concerning the court's findings against the Overholts' counterclaims; and (5) dismissal of the third party claim as moot.

## IV. STANDARD OF REVIEW

We set forth the overarching standards of review applicable to this appeal. In a bench trial of a law action, a trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly wrong. *McGill Restoration v. Lion Place Condo. Assn.*, 309 Neb. 202, 959 N.W.2d 251 (2021). After a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party. *Id.*

In an equity action, an appellate court reviews the record de novo and reaches an independent conclusion without reference to the conclusion reached by the trial court, except that where credible evidence is in conflict, the appellate court will give weight to the fact that the trial

court saw the witnesses and observed their demeanor while testifying. *Bush Island v. Kortum*, 30 Neb. App. 79, 965 N.W.2d 809 (2021).

An appellate court independently reviews questions of law decided by a lower court. *Noland v. Yost*, 315 Neb. 568, 998 N.W.2d 57 (2023).

Additional standards will be set forth at appropriate points in the analysis.

## V. ANALYSIS

### 1. DENIAL OF MOTION TO DISQUALIFY EXPERT WITNESS

The Overholts first assign as error that the district court erred in denying their motion to disqualify Softley, who was one of TGH's expert witnesses. The Overholts argue that the court erred in denying their motion to disqualify Softley because he "has virtually no qualifications that suit him to testify as to the value of trees and other shrubs, [let] alone the costs of removal," his testimony was "irrelevant" because it lacked the requisite degree of certainty, and his opinions were not based upon any reliable methodology. Brief for appellant at 20-21.

Softley provided testimony that the standing water resulted in the destruction of trees. The Overholts do not challenge his authority to make that determination. Instead, they challenge his testimony governing the value of the trees destroyed. Assuming without deciding that this licensed agronomist does not have sufficient expertise to know the value of the trees destroyed, a matter that seems peculiar, we note that Softley opined that damages exceeded $100,000 whereas Luers testified that the cost to remove and replace the 12 to 18 dead trees would be approximately $2,000 to $2,500 per tree. The Overholts do not assign error to the court's receipt of that testimony. The court determined that TGH's damages for the lost trees was $30,000. Clearly the court utilized Luers' testimony in its damage analysis and rejected Softley's opinion that TGH suffered damages exceeding $100,000.

As it relates to Softley's opinion on value, "[t]he *Daubert/Shafersman* requirements do not preclude a court presiding over a bench trial from admitting an expert's opinion subject to the court's later determination that the opinion is unreliable and should not be credited." *State v. Braesch*, 292 Neb. 930, 948, 874 N.W.2d 874, 888 (2016). In its *Daubert* ruling, the court foreshadowed how it would analyze any testimony from Softley on the replacement cost of trees and invited the Overholts to rebut any deficiencies in the cost analysis at trial. The Overholts failed to effectively rebut Leurs' testimony concerning the cost to replace the damaged trees and we reject this assignment.

### 2. ALLEGED ERRORS IN DISTRICT COURT'S FINDINGS IN FAVOR OF TGH

Second, the Overholts contend that the district court erred (1) in determining that a natural watercourse existed running in a south to north direction from the TGH property onto the Overholt property; (2) in determining that the Overholts negligently constructed the sediment pond and dam; and (3) in failing to consider whether the Overholts were justified in constructing the sediment basin.

The Overholts first contend that the district court "erred in determining that a 'natural watercourse runs in a south to north direction from the TGH Property onto the Overholt Property.'" Brief for appellant at 23. Specifically, the Overholts contend that "[t]he term 'natural watercourse'

has a very specific meaning in Nebraska law" and that "[t]he evidence presented at trial demonstrated that **a natural watercourse did not exist.**" Brief for appellant at 23-24 (emphasis in original).

Pursuant to Neb. Rev. Stat. § 31-202 (Reissue 2016), "[a]ny depression or draw two feet below the surrounding lands and having a continuous outlet to a stream of water, or river or brook shall be deemed a watercourse." Under the common law in Nebraska,

> "[d]iffused surface waters may be dammed, diverted, or otherwise repelled, if necessary, and in the absence of negligence. But when diffused surface waters are concentrated into a natural depression, draw, swale, or other drainway, the rule as to diffused surface waters does not apply. . . . '[A] natural drainway must be kept open to carry the water into the streams, and as against the rights of the upper proprietor, the lower proprietor cannot obstruct surface water when it has found its way to and is running in a natural drainage channel or depression. Thus, it has been held that it is the duty of a lower landowner who builds a structure across a natural drainway to provide for the natural passage through such obstruction of all the waters which may be reasonably anticipated to drain therein, and that this is a continuing duty.'"

*Romshek v. Osantowski*, 237 Neb. 426, 466 N.W.2d 482 (1991) (citation omitted).

The Overholts argue that the evidence adduced at trial does not support a determination that a natural watercourse existed because neither Kwapnioski nor Kalinski identified what happened to water after leaving the Overholts' property:

> . . . Kwapnioski was not able to identify any stream of water, river, or brook where the water flowed into. He believed that Salt Creek was the closest river or stream, but had no idea how far away it was. . . . Kalinski testified definitively that there is no continuous outlet to a stream of water, river or brook. Thus, it cannot be said that a natural watercourse existed.

Brief for appellant at 24. We find that whether or not a natural watercourse existed is not determinative in this case because, even if the watercourse on TGH's property became a diffused water surface upon entering the Overholt's land, as opposed to a continuing watercourse as argued, Nebraska law provides that in the absence of negligence, diffused surface waters may be dammed, diverted, or otherwise repelled. *Nichol v. Yocum,* 173 Neb. 298, 113 N.W.2d 195 (1962); *Kobza v. Bowers*, 23 Neb. App. 118, 868 N.W.2d 806 (2015). Because we find that the district court did not err in finding that the Overholts negligently constructed the silt pond and dam which then impeded the natural flow of water and diverted it onto TGH's property causing damage to TGH, we need not decide whether a natural watercourse existed on the Overholts' property.

Here, the evidence demonstrated that the Overholts built the sediment pond with the associated dam and conduits in anticipation of future development by TGH. As it relates to any future development of its property, TGH has a duty to ensure adequate protection against changing water flows onto the Overholt's property. But in the course of their own prophylactic measures, the Overholt's sediment pond and dam diverted the flow and backup of water onto the northeast corner of TGH's property. The evidence was replete with expert testimony from Kwapnioski and

Farmer as to inadequacies in the design of the sediment pond, dam, and conduits which resulted in the obstructed waterflow and backup, all of which predated the more significant occurrence from the rain event on May 28, 2020.

Further, the testimony established that the condition caused by the Overholts occurred long before TGH began constructing its access road, which was constructed, in part, to avoid the areas of water in the compromised portion of its land. In short, in reviewing the evidence, we find that the district court did not clearly err in determining the Overholts negligently constructed their sediment pond and dam, which materially and permanently diverted water onto TGH's property causing damage.

Further, we reject the Overholts' claim that the district court erred in failing to consider whether they were justified in constructing the sediment basin. The Overholts contend that construction of the sediment basin constituted "reasonable measures in anticipation" of the construction on TGH's property. Brief for appellant at 26. The Overholts argue that "[t]he testimony and report generated by . . . Pomajzl on behalf of [DEE] make clear the continuous and ongoing violations of [DEE] regulations and excessive erosion and runoff onto the Overholt property." *Id*.

In support of this claim, the Overholts cite to *Town of Everett v. Teigeler*, 162 Neb. 769, 778, 77 N.W.2d 467, 472 (1956), for the proposition that it is "'[t]he right of the owner, without negligence, to protect his land against surface water is a continuing one and the right is commensurate with the necessity for protection.'" quoting *County of Scotts Bluff v. Hartwig*, 160 Neb. 823, 71 N.W.2d 507 (1955). The flaw in the Overholts' argument is that the construction of the sediment basin occurred in 2017 or 2018 and TGH's construction on their access road did not begin until April 2020. At the time that the Overholts' constructed the sediment pond, TGH's property had not been developed and it remained agricultural land. We agree with TGH that, if this court were to accept the Overholts' "justification" argument, it "would, in effect be rewarding the Overholts for surmising a problem that did not exist, and then by their own conduct creating the very problem that [brought] his case before the courts." Brief for appellee at 30. The Overholts' argument that they were justified in constructing the sediment pond fails.

### 3. ERRORS REGARDING REMEDIES GRANTED TO TGH

The third broad category of errors assigned by the Overholts relate to the remedies granted by the district court to TGH: (a) injunctive relief; (b) monetary damages; and (c) the court's failure to find that TGH failed to mitigate its damages.

### (a) Injunctive Relief

The Overholts contend that the district court erred in ordering injunctive relief requiring the Overholts to restore their property to its condition prior to the installation of the sediment pond.

### (i) Standard of Review

An action for injunction sounds in equity. *Charter West Bank v. Riddle*, 314 Neb. 263, 989 N.W.2d 428 (2023). On appeal from an equity action, an appellate court tries factual questions de

novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court. *Id.*

*(ii) Analysis*

The Overholts argue that instead of ordering them to return their property to its previous condition prior to the installation of the sediment pond, the district court could have ordered the less extreme measure of lowering the 24-inch culverts of the sediment basin 18 inches to eliminate water from backing up on TGH's property.

As this court observed in *Melia v. Hansen*, 31 Neb. App. 517, 531-32, 985 N.W.2d 418, 429 (2023):

> Ordering an injunction provides an extraordinary remedy and should be granted only when there is actual and substantial injury. See *Harders v. Odvody*, 261 Neb. 887, 626 N.W.2d 568 (2001). The right that would be violated without the injunction must be clear, the damage must be irreparable, and a remedy at law would be inadequate to prevent a failure of justice. See *Central States Found. v. Balka*, 256 Neb. 369, 590 N.W.2d 832 (1999). Where an injury is at risk of repetition, equity looks to the nature of the injury instead of the magnitude of damage when affording relief. See *Lambert v. Holmberg*, 271 Neb. 443, 712 N.W.2d 268 (2006).

Injunctions should never be broader than necessary to afford complete relief to plaintiffs. See *Nolan v. Campbell*, 13 Neb. App. 212, 690 N.W.2d 638 (2004); *Watson v. Pick*, 31 Neb. App. 952, 992 N.W.2d 754 (2023).

In support of their argument that the court erred in ordering them to remove the sediment pond, the Overholts rely on testimony by Farmer that the problem of water backing up onto TGH's property could be resolved either through a redesign of that sedimentation pond or in lowering the elevation of the culverts in the sediment pond approximately 18 inches. However, Kwapnioski, a civil engineer specializing in water resources, opined that "[f]rom this assessment and my experience and training it is my professional opinion that nothing short of sediment pond removal will effectively preclude the obstruction and associated damage causing backing up of runoff water onto [TGH's property.]" And Farmer testified that, unless remedied, the water backing up onto TGH's property would continue to harm TGH's trees and would eventually affect the integrity of TGH's access road.

Having determined that backup of water onto TGH's land was the result of negligent construction of the sediment pond and dam, and based upon testimony of Kwapnioski, who testified that the only way to remedy the situation was removal, and whose testimony we find the most credible on this record, we hold that the district court did not err in ordering the Overholts to restore their property to its condition prior to the building of the sediment pond and dam.

(b) Monetary Damages

The Overholts next contend that that the district court erred in determining that TGH sustained monetary damages as a result of the Overholts' sediment basin. The Overholts claim that "TGH failed to prove either that it was damaged, or monetary damages to any reasonable degree

of certainty" and that "TGH presented no credible evidence the market value of the TGH Property is any less than what it was due to the alleged damage to certain trees and shrubs." Brief for appellant at 28-29.

We note that the Overholts' initial brief did not challenge the district court's award of $2,000 to TGH for lost rental income. And, although the Overholts do challenge the $2,000 of lost rental income in their reply brief, errors not assigned in appellant's initial brief are waived and may not be asserted for first time in the appellant's reply brief. See *Linscott v. Shasteen*, 288 Neb. 276, 847 N.W.2d 283 (2014). Accordingly, we decline to consider whether the district court erred in awarding TGH $2,000 for lost rental income. We proceed to consider whether the district court erred in awarding TGH $30,000 in monetary damages for the loss of trees.

### (i) Standard of Review

The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved. *Funk v. Lincoln-Lancaster Cty. Crime Stoppers*, 294 Neb. 715, 885 N.W.2d 1 (2016).

### (ii) Analysis

In *Keitges v. VanDermeulen*, 240 Neb. 580, 589-90, 483 N.W.2d 137, 143 (1992), the Nebraska Supreme Court considered a landowners' suit to recover damages for destruction of trees, shrubs, and vegetation on their property when the adjoining landowner attempted to clear a path for the construction of a fence. In determining this issue of first impression, the Nebraska Supreme Court held that

> in an action for compensatory damages for cutting, destroying, and damaging trees and other growth, and for related damage to the land, when the owner of land intends to use the property for residential or recreational purposes according to his personal tastes and wishes, the owner is not limited to the difference in value of the property before and after the damage or to the stumpage or other commercial value of the timber. Instead, he may recover as damages the cost of reasonable restoration of his property to its preexisting condition or to a condition as close as reasonably feasible. However, the award for such damage may not exceed the market value of the property immediately preceding the damage. See *"L" Investments, Ltd. v. Lynch,* 212 Neb. 319, 322 N.W.2d 651 (1982). If improvements have been constructed on the damaged realty, recovery for restoration of damaged trees and vegetation should be limited to an amount not exceeding the market value of the land as if it were unimproved.
>
> Furthermore, under this rule, when there is no factual question but that the plaintiffs' intended use of the property is for residential or recreational purposes and the plaintiff seeks only to recover the cost of restoring his property, evidence relating to the land's diminution in value has no relevance, although evidence of the property's value immediately before the damage is relevant.

*Keitges v. VanDermeulen*, 240 Neb. at 589-90, 483 N.W.2d at 143.

The burden of establishing the cost of repair shall be upon the party seeking recovery. If the party against whom recovery is sought believes that the cost of repair exceeds the market value of the property just before damage, then the burden shall be upon such party to introduce evidence to establish that fact, and it will then be up to the trier of fact to determine which of the two measures of damages should be employed. Absent evidence that the cost of repair or restoration exceeds the market value of the property just before damage, it will be presumed that the cost of repair or restoration does not exceed the market value of the property just before damage.

*"L" Investments, Ltd. v. Lynch*, 212 Neb. 319, 328-29, 322 N.W.2d 651, 657 (1982).

As we noted before, Softley testified that Overholts' sediment pond diverted water to the northeast corner of TGH's property resulting in standing water that compromised trees and vegetation in that area. Luers testified that TGH lost between 12 and 18 trees from the conditions created by the Overholts' construction of the sediment pond and dam and that the replacement cost was between $2,000 to $2,500 per tree. And, because the Overholts failed to introduce any evidence regarding the cost of TGH's property prior to the damage, it is presumed that the cost of the restoration does not exceed the market value of the property just prior to the damage. Accordingly, we find that the district court did not err in awarding TGH $30,000 for the damage to its trees.

### (c) TGH's Failure to Mitigate Damages

The Overholts contend that the district court erred in not finding that TGH failed to mitigate its damages. The Overholts contend that "TGH could have moved the access road further south to add additional elevation and distance from the boundary of the two properties, as the lot where water backed up is an outlot with no plans for development" and that "TGH took no steps to prune, clean up underbrush and growth, or anything else to help the plants." Brief for appellant at 30-31.

In *Armstrong v. Clarkson College*, 297 Neb. 595, 625, 901 N.W.2d 1, 24 (2017), the Nebraska Supreme Court explained:

Regarding the mitigation of damages, we have said: "Under the doctrine of avoidable consequences, which is another name for the failure to mitigate damages, a wronged party will be denied recovery for such losses as could reasonably have been avoided, although such party will be allowed to recover any loss, injury, or expense incurred in reasonable efforts to minimize the injury. . . . A plaintiff's failure to take reasonable steps to mitigate damages bars recovery, not in toto, but only for the damages which might have been avoided by reasonable efforts."

A party is required only to mitigate damages that might have been avoided by "reasonable efforts." A plaintiff is "'not required to unreasonably exert himself or to incur an unreasonable expense in order to'" mitigate damages. In reviewing the reasonableness of a party's actions to mitigate damages, we often consider three factors: (1) the cost or difficulty to the plaintiff of mitigation, (2) the plaintiff's financial ability to mitigate, and (3) the defendant's actions to inhibit the plaintiff from mitigating damages.

We reject the Overholts' claim that TGH failed to mitigate its damages. The evidence established that TGH moved the location of its access road "10 to 15 feet south" of its original location to avoid the pooling water on its own property caused by the Overholts. And, regarding the Overholts' claim that TGH failed to provide proper care for the trees that had roots submerged in water, the Overholts' suggestion of pruning and cleaning up underbrush and growth would have little impact as it relates to the recurring nature of flooding in the area where the trees' roots were located. This assignment of error is without merit.

### 4. OVERHOLTS' COUNTERCLAIMS

The Overholts contend that the district court erred in (a) denying their counterclaims alleging nuisance, trespass, and negligence; (b) denying their claim for monetary damages; (c) failing to find that TGH's construction of the access road caused a change in drainage to the Overholts' property; (d) denying their claim of mutual recognition and acquiescence; and (e) denying their claim of adverse possession.

Because, as we explain below, the Overholts failed to show that TGH's newly constructed access road caused damage to the Overholt property, and a showing of damages is required under claims of nuisance, trespass and negligence, we consider those three claims together for purposes of this appeal.

### (a) Nuisance, Trespass and Negligence Claims

The Overholts contend that the district court erred in failing to find that TGH's development constituted a nuisance. Specifically, they contend that "TGH changed the natural drainage and took improper measures to control erosion and sediment runoff during construction of the access road." Brief for appellant at 33. The Overholts also contend that the district court erred in failing to find that TGH's development caused a trespass on their property and in failing to find that TGH was negligent in its building of the access road. They contend that the evidence of TGH's repeated DEE violations along with Dr. Kalinski's testimony and Farmer's admissions "demonstrate TGH failed to conform to the standard of care." Brief for appellant at 35. We briefly summarize the law for each claim below.

As it relates to a nuisance action, in *Skyline Woods Homeowners Assn. v. Broekemeier*, 276 Neb. 792, 816, 758 N.W.2d 376, 394 (2008), the Nebraska Supreme Court quoted § 822 of the Restatement (Second of Torts):

"One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities."

Regarding liability for trespass, the Nebraska Supreme Court noted in *Lambert v. Holmberg*, 271 Neb. 443, 448, 712 N.W.2d 268, 274 (2006), that

[L]iability for trespass exists if an actor intentionally "enters land in the possession of [another], or *causes a thing* or a third person to do so." (Emphasis supplied.) Restatement, *supra,* § 158(a) at 277. . . . An "actor, without himself entering the land, may invade another's interest in its exclusive possession by throwing, propelling, or placing a thing either on or beneath the surface of the land." Restatement, *supra,* § 158, Comment on Clause (a)*i.* at 278.

Lastly, to prevail in any negligence action, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and resulting damages. *Lewison v. Renner*, 298 Neb. 654, 905 N.W.2d 540 (2018); *Ronnfeldt Farms v. Arp*, 32 Neb. App. 490, 1 N.W.3d 540 (2023). The violation of a regulation or statute is not negligence per se but may be evidence of negligence to be considered with all the other evidence in the case. *Scheele v. Rains*, 292 Neb. 974, 874 N.W.2d 867 (2016).

As to all three claims for recovery, the Overholts allege that TGH's construction of the access road diverted sediment upon their land, and more specifically, their catfish pond. Stated differently, as to such claims, in order to prevail, the Overholts were legally obligated to prove that TGH's newly constructed access road proximately caused sediment to enter upon their property. As we read the record, the Overholts appear to specifically relate these claims to the May 23, 2020, rain event and argue that TGH's failure to comply with regulatory stormwater and erosion controls to reduce runoff velocity, erosion, and sediment control resulted in an increased flow of sediment upon their property. Notably, the record is devoid of any evidence that the engineered design of the roadway was inadequate. Instead, the focus appeared to be on TGH's interactions with Pomajzl and DEE in relation to the installation of silt fences, adequate seeding, and wattles to control stormwater runoff.

Although there is evidence of notice violations issued by Pomajzl to induce compliance with stormwater control measures, notably, there was no evidence that the lack of erosion controls proximately resulted in sediment being diverted onto the Overholts' property. More specifically, although there was evidence following the May 23, 2020, rain event and flooding that occurred that additional sediment made its way into the Overholts' catfish pond, there was a dearth of evidence that the sediment was generated from TGH's property or that it was directly related to inadequate control mechanisms. Because we find that the district court did not clearly err in finding that the Overholts failed to prove damage caused by TGH, we find that the court did not err in dismissing the Overholts' claims for nuisance, trespass, and negligence.

### (b) Monetary Damages

The Overholts contend that the district court erred in failing to find that TGH caused monetary damages to them. As we stated above, because the Overholts failed to prove that TGH's access road construction resulted in damage to the Overholts, we find that the district court did not err in dismissing the Overholts' claim for damages.

(c) Change in Drainage

The Overholts next contend that the district court erred in failing to find that TGH's construction of the access road caused a change in drainage to their property by adding additional drainage areas, increasing the velocity and flow rate of drainage, and increasing the sediment and runoff to the Overholts' property. However, TGH adduced expert testimony controverting the Overholts' claims. Kwapnioski testified that the three culverts located on TGH's property allowed the water to flow in a similar manner as it had historically done and that the culverts allowed water to pass through efficiently but not with such force so as to cause erosion at the discharge point. Further, according to Kwapnioski, "only about 33 acres (38%) now and historically contributed runoff to the [Overholts'] property." Because the Overholts did not establish that TGH's construction of the access road increased either the amount of water or sediment passing to its property, this claim fails.

(d) Mutual Recognition and Acquiescence

Regarding their claim of mutual recognition and acquiescence, the Overholts claim that they "produced undisputed evidence that they, and TGH's predecessors in interest acquiesced to the fence line as the boundary between the two properties for more than ten years." Brief for appellant at 36.

An action to ascertain and permanently establish corners and boundaries of land under Neb. Rev. Stat. § 34-301 (Reissue 2016) is an equity action. *Puncochar v. Rudolf*, 315 Neb. 650, 999 N.W.2d 127 (2024). On appeal from an equity action, an appellate court decides factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the trial court's determination. *Id.*

In *Bush Island v. Kortum*, 30 Neb. App. 79, 96-97, 965 N.W.2d 809, 822 (2021), this court discussed the doctrine of mutual recognition and acquiescence:

> Under the doctrine of mutual recognition and acquiescence, while a boundary may be fixed in accordance with a survey, when a different boundary is shown to have existed between the parties for the 10-year statutory period, it is that boundary line which is determinative and not that of the original survey. *Sila v. Saunders*, 274 Neb. 809, 743 N.W.2d 641 (2008). See, also, § 34-301. The rule long established in this jurisdiction is that where a boundary, supposed to be the true line established by the government survey, is acquiesced in by the adjoining owners for more than 10 years, it is conclusive of the location. *Sila v. Saunders, supra*.

> To claim a boundary line by acquiescence, both parties must have knowledge of the existence of a line as the boundary. *Madson v. TBT Ltd. Liability Co.*, 12 Neb. App. 773, 686 N.W.2d 85 (2004). It is insufficient for one party to merely establish a line and take possession up to that line. *Id.* For acquiescence to operate, the other party must assent, by words, conduct, or silence, to a line as the boundary. See *id.* In order to establish a boundary by acquiescence, it is not necessary that the acquiescence should be manifested by a conventional agreement, but recognition and acquiescence must be mutual, and both parties must have knowledge of the existence of a line as a boundary line. *Id.*

The Overholts contend that they and the prior owner of TGH's land had recognized the fence line as the boundary of the two properties for over 20 years. However, the only evidence regarding recognition of the fence line as the boundary between the Overholts' property and TGH's property was Overholt's testimony that the fence was present when he purchased his property in 2000, that he always treated the fence line as the property line, and that the prior owner of TGH's property indicated that the fence line was the property line.

Triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or the lack thereof. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). Evidence not directly contradicted is not necessarily binding on the triers of fact and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence. *Id.*

The district court specifically found that "both parties were unsure of the boundary line and sought independent surveys to determine the property line" and that "[p]hotographic evidence and testimony established that much of the land between the properties was not maintained by either party." The district court heard and observed the witnesses and this court will not substitute its judgment for that of the trier of fact. Accordingly, we find that the district court did not err in denying the Overholts' claim of mutual recognition and acquiescence.

(e) Adverse Possession

Regarding their claim of adverse possession, the Overholts contend that the district court erred in determining the Overholts had not met their burden of proof with regard to determining the fence line as the boundary line of the Overholt and TGH properties.

A party claiming title through adverse possession must prove by a preponderance of the evidence that the adverse possessor has been in (1) actual, (2) continuous, (3) exclusive, (4) notorious, and (5) adverse possession under a claim of ownership for a statutory period of 10 years. *Beckner v. Urban*, 310 Neb. 746, 968 N.W.2d 855 (2022). The acts of dominion over land allegedly adversely possessed must, to be effective against the true owner, be so open, notorious, and hostile as to put an ordinarily prudent person on notice of the fact that the lands are in the adverse possession of another. *Siedlik v. Nissen*, 303 Neb. 784, 931 N.W.2d 439 (2019). If an occupier's physical actions on the land constitute visible and conspicuous evidence of possession and use of the land, that will generally be sufficient to establish that possession was notorious. *Id.*

Luers disputed the Overholts' adverse possession claim because

as you go from Southwest 98th west, along the property line, there was no fence originally. And then I put up a fence and he tore it down. And then he put up a fence where . . . he knew it was, and then . . . Overholt moved the fence south . . .

. . . . Where the flag was that our surveyor put in the ground was the fence that Mr. Overholt put in, and that was . . . sometime [in] 2019 or '20. And then –

. . . .

-- he moved the fence south when we were building our road in '20. And then the [county] court ordered him to remove that. And so, for a while there was no fence. And then we both put up a fence, and that's for about the first 30, 40 feet off of Southwest 98th.

Then you get into this area where it's just total brush, never maintained by either side. It's brush and trees. And, frankly, you can't see a fence, and if there is one there, it's intermittent.

Then, as you get closer to the water line – waterway, there was on occasion a single line fence but sometimes it was in the ground, sometimes it was around trees. There was no clear defined area, and certainly not maintained.

And then as you go further west, on the last third of the Overholt property, there was a single line fence, but it wasn't even mowed up to that fence by the Overholts. . . . There simply was no open and notorious and hostile use of property, and nor was it clearly defined, nor was it maintained.

In *Hudkins v. Hempel*, No. A-21-1011, 2023 WL 1113234 (Neb. App. Jan. 31, 2023) (selected for posting to court website), this court recently found that all of the elements of adverse possession were met where, notwithstanding the fact that only remnants of a fence were left, the record provided unequivocal testimony that the plaintiffs actually, continuously, exclusively, notoriously, and adversely farmed up to the border of what was believed to be the old fence line for over 10 years.

In contrast to that record, as we noted in the preceding section, the district court in the instant case found that both parties were unsure of the exact boundary line and sought independent surveys to determine the property line. Further, the evidence was clear that the area of the property line was overgrown with brush and neither party maintained the areas of the fence line or demonstrated an intent to possess the disputed area which would trigger application of the rule. Accordingly, the district court did not err in denying the Overholts' claim of adverse possession because there was no open, notorious, hostile or exclusive use, and no defined area of possession, of the disputed area.

We separately note that this result is consistent with the ruling of the county court in separate litigation between these parties where that court determined that the Overholts trespassed upon this same disputed area when it erected a new fence near the remnants of the old fence. The Overholts did not appeal from that order and neither party raised the prior proceeding in connection with this claim. Regardless, based upon the results of our analysis, we do not have inconsistent findings and we reject the Overholts' claim of adverse possession of the disputed area.

5. DISMISSAL OF THIRD-PARTY CLAIM AS MOOT

The Overholts claim that the district court erred in dismissing TGH's third-party complaint as moot rather than dismissing it on its merits. They contend that TGH's third-party complaint was filed outside the statute of limitations and did not relate back to the filing of TGH's original complaint.

Here, the district court denied all of the Overholts' counterclaims against TGH which rendered TGH's third-party claim against Thomas moot. Accordingly, the district court did not err in dismissing TGH's third-party claim on the basis that it was moot. See *Christensen v. Broken Bow Public Schools*, 312 Neb. 814, 981 N.W.2d 234 (2022) (affirming district court's dismissal

of defendant's third-party complaint as moot after court dismissed all of plaintiff's claims against defendant).

## VI. CONCLUSION

Having considered and rejected the Overholts' claims on appeal, we affirm the decision of the district court.

AFFIRMED.